1
2
3
4          **UNITED STATES DISTRICT COURT**
5              **DISTRICT OF NEVADA**
6
7   ENCARNACION AGUILAR,                      )
8                          Plaintiff,         )     Case No. 2:06-CV-01002-KJD-PAL
                                              )
9   vs.                                       )       **ORDER**
                                              )
10  MR. KULOLOIA, et al.,                     )
                                              )
11                         Defendants.        )
                                              )
    _____)
12

13      Presently  before the Court is Defendants' Motion to Dismiss (#24).  Plaintiff filed a  Response

14  in Opposition (#32) to which Defendants filed a Reply (#34).  Also before the Court is Plaintiff's

15  Second Ex Parte Motion for Appointment of Counsel (#33).

16                          **BACKGROUND**

17  **I.      Procedural History**

18      This is a civil rights action filed under 18 U.S.C. §1983 by an inmate at the High Desert State

19  Prison in Indian Springs, Nevada.  The plaintiff is proceeding *pro se* in this matter, and was granted *in*

20  *forma pauperis* status on September 21, 2006.  Plaintiff filed his Complaint (#4) on August 22, 2006, in

21  which he alleges the defendants at the Nevada Department of Corrections ("NDOC"), housed him with

22  a dangerous gang member, Richard Delgado ("Delgado") who severely beat him; housed him with

23  inmates who smoked, exposing the plaintiff, a non-smoker, to unacceptably high levels of

24  environmental tobacco smoke; failed to timely or adequately provide medical treatment for wounds

25  including four broken bones in the nose and face sustained as a result of the beating by his

26  cell mate; affirmatively denied the plaintiff necessary medical care; and required the plaintiff to pay

27  restitution in the form of his cell mate's medical bills without affording the plaintiff an opportunity to

28

1   appeal the decision or the amount of restitution, all in violation of his constitutional rights under the

2   Eighth and Fourteenth Amendments.

3   **II.     Parties Arguments**

4         Defendants have presented materials outside of the pleadings, and therefore, pursuant to Federal

5   Rule of Civil Procedure 12(b)(6), the Court must consider the motion as a request for summary

6   judgment under Rule 56.  Pursuant to Rule 56, Defendants argue that there exist no genuine issues of

7   material fact that preclude judgment as a matter of law in their favor.  Defendants argue that Plaintiff

8   has failed to exhaust his administrative remedies prior to filing his complaint as required by § 1997e of

9   the Prison Litigation Reform Act of 1995 ("PLRA").  They also argue that Defendant Kuloloia is not

10   properly named in this suit because he had no personal involvement in the activities Aguilar alleges,

11   and therefore cannot be liable under § 1983.  In addition, Defendants claim they are immune from suit

12   in their official capacities under the Eleventh Amendment and entitled to qualified immunity in their

13   individual or personal capacities on every count.  Finally, Defendants argue that punitive damages are

14   neither appropriate, nor recoverable against the state pursuant to state statute.

15         In response, Aguilar contends that he attempted to exhaust his administrative remedies prior to

16   filing his complaint in this action by filing a grievance nine days after the conclusion of his

17   administrative hearing appealing the judgment and amount of restitution he was ordered to pay.  He

18   asserts that he received no response to this grievance, and filed additional grievances in an attempt to

19   follow up.  He argues these subsequent grievances were an attempt to resolve this matter

20   administratively, and not intended to circumvent the administrative process.  As he was never afforded

21   the opportunity to be heard on his appeal or to contest the amount of restitution awarded, Aguilar argues

22   that he was denied his due process rights under the Fourteenth Amendment.  He also requests copies of

23   Delgado's medical bills so that he can contest the reasonableness of the treatment Delgado received.

24   Aguilar concedes he improperly identified Mr. Kuloloia as a defendant and asks the court to either stay

25   its decision on the motion to dismiss, or deny it outright, to allow him extra time to conduct discovery

26   to identify the proper defendant.  He also concedes that the Eleventh Amendment would bar him from

27   recovering against any of Defendants in their official capacity, but contends that Eleventh Amendment

28   protection does not extend to claims against Defendants in their individual capacities.  In addition, he

1   argues that none of Defendants are entitled to qualified immunity because they each demonstrated

2   deliberate indifference to his serious medical needs by failing to respond to his environmental tobacco

3   smoke ("ETS") grievances.  Aguilar asserts Defendants discriminated in favor of his cell mate Delgado

4   by treating his injuries first after the altercation, while delaying treatment for Aguilar's more serious

5   injuries.  Finally, Aguilar asserts that punitive damages are both recoverable and appropriate in this case

6   as Defendants have demonstrated malicious, wanton and oppressive conduct.

7          In their Reply, Defendants point out that none of Aguilar's grievances indicated that his cell

8   mate Delgado was likely to assault him or that his health was in jeopardy from Delgado's smoking.  In

9   addition, Defendants contend that all of the delays prior to Aguilar receiving medical treatment were

10  reasonable under the circumstances given the need to ensure his safety and that none of his injuries

11  were life-threatening.  Defendants refuse to provide Aguilar with a copy of Delgado's medical bills as

12  they are confidential and would reveal what kind of medical treatment Delgado received.  Finally, they

13  argue that Aguilar never indicated he had a severe medical condition that would prohibit him from

14  being housed with a smoker.

15                                         **DISCUSSION**

16  **I.      Standard of Review**

17          The court should not dismiss a complaint under FRCP 12(b)(6) "unless it appears

18  beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to

19  relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  See also Yamaguchi v. U.S. Dept. of the Air

20  Force, 109 F.3d 1475, 1481 (9th Cir. 1997).  "Evidence outside the complaint should not be considered

21  in ruling on a motion to dismiss."  Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th

22  Cir. 2001).  In examining the complaint, "conclusory allegations of law and unwarranted inferences are

23  insufficient to defeat a motion to dismiss."  Ove v. Gwinn, 264 F.3d 817, 821 (9th Cir. 2001), citing,

24  Assoc. General Contractors v. Met. Water Dist., 159 F.3d 1178, 1181 (9th Cir. 1998).  The court may

25  dismiss a complaint for "(1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable

26  legal claim."  Henkle v. Gregory, 150 F. Supp. 1067, 1071 (D. Nev. 2001), quoting, Smilecare Dental

27  Group v. Delta Dental Plan, 88 F.3d 780, 783 (9th Cir. 1996), quoting, Robertson v. Dean Witter

28  Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

                                              3

1       In considering a motion to dismiss for failure to state a claim under FRCP 12(b)(6), the court

2   must accept as true all material allegations in the complaint as well as all reasonable inferences which

3   may be drawn from such allegations.  Pareto v. F.D.I.C., 139 F.3d 696, 699 (9th Cir. 1998).  The

4   allegations in the complaint also must be construed in the light most favorable to the nonmoving party.

5   Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  The purpose of a motion to

6   dismiss under FRCP 12(b)(6) is to test the legal sufficiency of the complaint.  North Star Int'l v.

7   Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983).  If the motion is to be granted, it must

8   appear to a certainty that Plaintiff will not be entitled to relief under any set of facts that could be

9   proven under the allegations of the complaint.  Symington, 51 F.3d at 1484.

10          The Court has already determined that Plaintiff's complaint states claims upon which relief may

11   be granted in its Order (#3) in which it "screened"Plaintiff's complaint pursuant to 28 U.S.C. § 1915A.

12   When a court "screens" the complaint, it applies the same Rule 12(b)(6) standard to Plaintiff's claims

13   Defendants request the Court apply in their motion to dismiss.  Defendants should be well aware that

14   the Court conducted this screening after they filed a motion for screening (#12) which the Court

15   promptly denied (Order #15), citing the Court's prior screening Order (#3).  In addition, Defendants

16   motion does not argue the Court's screening order was wrongly decided.   Accordingly, to the extent

17   Defendants' motion requests the Court dismiss Plaintiff's complaint for failure to state a claim upon

18   which relief may be granted, it is denied.

19          However, that to the extent a motion to dismiss contains materials outside the pleadings, the

20   Court must treat a motion to dismiss as a motion for summary judgement under FRCP 56.  Therefore,

21   to the extent Defendants' arguments refer to materials outside of the pleadings, the motion shall be

22   treated as one for summary judgment.  Summary judgment under Federal Rule of Civil Procedure 56 is

23   proper, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

24   affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party

25   is entitled to judgment as a matter of law."  The party moving for summary judgment has the initial

26   burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S.

27   317, 323 (1986).  Once the moving party has presented evidence which, if uncontroverted, would entitle

28   the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific

4

facts demonstrating that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth.  See SEC v. Seaboard Corp., 677 F.2d 1289, 1293 (9th Cir. 1982).  The substantive law governing a claim or defense determines whether a fact is material.  T.W. Electric Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  After drawing all inferences in favor of the responding party, summary judgment will be granted only if all reasonable inferences defeat the non-moving party's claims.  Id. at 1298.  Reasonable doubts about the existence of a factual issue should be resolved against the moving party.  T.W. Electric Serv., 809 F.2d at 630-31.

A party opposing summary judgment cannot stand on its pleadings once the movant has submitted affidavits or other similar materials.  Affidavits that do not affirmatively demonstrate personal knowledge are insufficient.  British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978), cert. denied, 440 U.S. 891 (1979).  Similarly, "legal memoranda and oral argument are not evidence and they cannot by themselves create a factual dispute sufficient to defeat summary judgment where no dispute otherwise exists."  British Airways, 585 F.2d at 952.  If the factual context makes the opposing party's claims implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. at 323-24; Matsushita Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); California Arch. Bldg. Prod. v. Franciscan Ceramics, 818 F.2d 1466, 1468 (9th Cir. 1987), cert. denied, 484 U.S. 1006 (1988).  To preclude entry of summary judgment, the non-moving party must do more than show that there is some "metaphysical doubt" as to the material facts.  Matsushita Elec. Indus. Co., 475 U.S. at 586.  It is a jury function to determine credibility, the weight of the evidence, and legitimate inferences from the facts, not the function of a judge in ruling on a motion for summary judgment.  Anderson, 477 U.S. at 255.

5

## II.      Immunity from Suit

Defendants claim that by being named in their official capacity in this suit, they are immune from § 1983 liability under the Eleventh Amendment.  "Claims under § 1983 are limited by the scope of the Eleventh Amendment."  Doe v. Lawrence Livermore Nat. Laboratory, 131 F.3d 836, 839 (9th Cir. 1997).  "The Amendment . . . enacts a sovereign immunity from suit, rather than a non-waivable limit on the Federal Judiciary's subject-matter jurisdiction."  Idaho v. Couer d'Alene Tribe, 521 U.S. 261, 267 (1997).  "The Eleventh Amendment prohibits federal Courts from hearing suits brought against an unconsenting state.  Though its language might suggest otherwise, the Eleventh Amendment has long been construed to extend to suits brought against a state both by its own citizens, as well as by citizens of other states." Brooks v. Sulphur Springs Valley Elec. Coop., 951 F.2d 1050, 1053 (9th Cir. 1991) (citation omitted).  "Absent waiver, neither a State nor agencies  acting under its control may be subject to suit in federal Court."  Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 145 (1993) (quotations removed).

In Will v. Michigan Dep't of State Police, the Supreme Court held that "States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes" are not "persons" under § 1983.  491 U.S. 58, 70 (1989).  "Moreover, Will clarified that a suit against a state official in his official capacity is no different from a suit against the State itself.  Therefore, state officials sued in their official capacities are not "persons" within the meaning of § 1983."  Doe, 131 F.3d at 839 (citations removed).

> However, there is one exception to this general rule: When sued for prospective injunctive relief, a state official in his official capacity is considered a "person" for § 1983 purposes. In what has become known as part of the *Ex parte Young* doctrine, a suit for prospective injunctive relief provides a narrow, but well-established, exception to Eleventh Amendment immunity.

Id. (citing Ex parte Young, 209 U.S. 123 (1908)).  In addition, the Eleventh Amendment does not prohibit suits seeking damages against state officials in their *personal* or individual capacity.  See Hafer v. Melo, 502 U.S. 21, 30 (1991).

6

1   In the instant case, Aguilar asserted claims against the named defendants in both their individual

2   and official capacities.  In his opposition, however, he concedes that the Eleventh Amendment limits

3   him to claims against the named defendants in their individual capacities.  In this argument the parties

4   appear to be in agreement.  Accordingly, the Court finds that Defendants are immune from suit in their

5   official capacities.

6   **III.   Qualified Immunity**

7   Defendants argue that they are additionally entitled to dismissal of the Eighth and Fourteenth

8   Amendment claims against each of Defendants in their individual capacities under the defense of

9   qualified immunity.  The defense of qualified immunity is available if the official's conduct is

10  objectively reasonable "as measured by reference to clearly established law."  Harlow v. Fitzgerald, 457

11  U.S. 800, 818 (1982).  A defendant is entitled to summary judgment based on the defense of qualified

12  immunity only if, viewing the facts in the light most favorable to Plaintiff, the facts as alleged do not

13  support a claim that the defendant violated clearly established law.  Mitchell v. Forsyth, 472 U.S. 511,

14  528 (1985).  This is a purely legal question.  Id.; see also, Wood v. Ostrander, 879 F.2d 583, 591 (9th

15  Cir. 1989).  Qualified immunity provides "an entitlement not to stand trial or face the other burdens of

16  litigation, conditioned on the resolution of the essentially legal question."  Mitchell, 472 U.S. at 526.

17  Resolving the issue of qualified immunity involves a two-step inquiry.  Clement v. Gomez, 298

18  F.3d 898, 903 (9th Cir. 2002)  First, the Court must determine whether "[t]aken in the light most

19  favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a

20  constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001).  A negative answer ends the analysis,

21  with qualified immunity protecting Defendants from liability.  Id.  "If a constitutional violation

22  occurred, a Court must further inquire whether the right was clearly established."  Clement, 298 F.3d at

23  903 (quoting Saucier, 533 U.S. at 201) (internal quotations removed).  If the law did not put the

24  officials on notice that their conduct would be clearly unlawful, summary judgment based on qualified

25  immunity is appropriate.  Saucier, 533 U.S. at 202.

26  **A.   Eighth Amendment Claims**

27  The Eighth Amendment prohibits "cruel and unusual punishment."  U.S. Const. amend. XIII.

28  The amendment protects against formally imposed punishment that is cruel and unusual, as well as

1   certain forms of official conduct amounting to "sufficiently serious" deprivations "denying the minimal

2   civilized measure of life's necessities . . .."  Wilson v. Seiter, 501 U.S. 294, 297-303 (1991) (internal

3   quotations removed).  If "the pain inflicted is not formally meted out *as punishment* by the statute or the

4   sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify"

5   as cruel and unusual punishment.  Id. at 300 (emphasis in original).  To prevail on a claim for

6   punishment not formally imposed on an inmate, a plaintiff must show "(1) that the specific prison

7   official, in acting or failing to act, was deliberately indifferent to the mandates of the eighth amendment

8   and (2) that this indifference was the actual and proximate cause of the deprivation of the inmates'

9   eighth amendment right to be free from cruel and unusual punishment."  Leer v. Murphy, 844 F.2d 624,

10  634 (9th Cir. 1988).

11                              In addition, prison officials who actually knew of a

12                              substantial risk to inmate health or safety may be found free

13                              from liability if they responded reasonably to the risk, even

14                              if the harm ultimately was not averted. A prison official's

15                              duty under the Eighth Amendment is to ensure reasonable

16                              safety, a standard that incorporates due regard for prison

17                              officials' unenviable task of keeping dangerous men in safe

18                              custody under humane conditions.

19  Farmer v. Brennan, 511 U.S. 825, 844 (1994) (internal quotations and citations removed).  To sustain

20  such a claim, sweeping conclusory allegations will not suffice; the prisoner must set forth specific facts

21  as to each individual defendant's deliberate indifference.  Leer, 844 F.2d at 634.  In addition, a

22  "supervisor cannot be held personally liable under § 1983 for the constitutional deprivations caused by

23  his subordinates, absent his participation or direction in the deprivation."  Ybarra v. Reno Thunderbird

24  Mobile Home Village, 723 F.2d 675, 680 (9th Cir. 1984).  However, "Courts have recognized a cause of

25  action under § 1983 where it was alleged that a supervisor's failure to train or to supervise personnel led

26  to the deprivation of constitutional rights . . . or where it was alleged that a policy existed that led to the

27  deprivation of constitutional rights."  Id. (citations omitted).

28

1   Aguilar's claims fall under three general categories.  The first concerns allegations that Mr.

2   Kuloloia ignored Aguilar's request to change cells because he feared his cell mate Delgado would attack

3   him.  This first category is only included in Count I against defendant Mr. Kuloloia.  The second

4   category of claims alleges that prison officials and medical staff denied and/or delayed treatment for his

5   injuries arising from his altercation with his cell mate Delgado.  These claims are contained in counts II-

6   V and VII.  The third concerns his claim for ETS exposure, and is contained in count I and VIII.  As the

7   three categories of claims are largely unrelated, they shall be analyzed separately.

8              **1.       Request for Stay or Dismissal to Conduct Further Discovery on Count I.**

9   Defendants argue that Mr. Kuloloia is not the correct defendant in count I of the complaint

10  because he did not work as a caseworker for Aguilar.  The argument is supported by the Affidavit of

11  William Kuloloia.  (Defs.' Ex. C.)  In response, Aguilar acknowledges he misidentified Mr. Kuloloia as

12  the person responsible for the conduct alleged in count I.  He  requests via an affidavit contained within

13  the body of his motion that the Court stay its decision on Defendants' motion to dismiss, or deny it

14  outright, to allow him time to conduct discovery to determine the identity of the person responsible for

15  the actions alleged in count I of his complaint.

16  Although he does not specifically invoke Federal Rule of Civil Procedure 56(f), Aguilar's request

17  broadly corresponds to the provisions of Rule 56(f).  Rule 56(f) provides:

18              Should it appear from the affidavits of a party opposing the motion that the

19              party cannot for reasons stated present by affidavit facts essential to justify

20              the party's opposition, the Court may refuse the application for judgment

21              or may order a continuance to permit affidavits to be obtained or

22              depositions to be taken or discovery to be had or may make such other

23              order as is just.

24  Fed. R. Civ. P. 56(f).  As Defendants supported this argument with materials outside the pleadings in the

25  form of Kuloloia's affidavit, the Court must treat their request for relief under Rule 56.  It is likewise

26  appropriate to consider Aguilar's request under Rule 56(f).  Moreover, Rule 56(f) was designed to

27  remedy the very kind of problem Aguilar faces in the instant situation. Defendants filed their motion to

28  dismiss as the responsive pleading in this matter.  Thus, Aguilar has not had any opportunity to conduct

9

1  discovery in this matter that would have allowed him to properly identify the person allegedly

2  responsible for the conduct alleged in count I.   The Court therefore finds it appropriate to deny

3  Defendants request for summary judgment on count I to allow Aguilar to conduct discovery to identify

4  the proper individual responsible for the conduct alleged in count I.  However, since Plaintiff does not

5  dispute that Defendant Kuloloia has been improperly named, Kuloloia is dismissed as a defendant in

6  count I.

7          **2.**        **Counts II-V and VII Alleging Denial and/or Delay of Medical Treatment**

8          Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison medical

9  treatment, an inmate must show 'deliberate indifference to serious medical needs.'" Jett v. Penner, 439

10  F.3d 1091, 1096 (9th Cir. 2006) (quoting Estelle, 429 U.S. at 104).  The Ninth Circuit employs a two-

11  part test of deliberate indifference requiring a plaintiff to (1) first show a "serious medical need" by

12  demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the

13  unnecessary and wanton infliction of pain," and (2) the defendant's response to the need was deliberately

14  indifferent.  McGuckin v. Smith 974 F.2d 1050, 1059-60 (9th Cir. 1991), overruled on other grounds by

15  WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (citing Estelle 429 U.S. at 104)

16  (internal quotations removed).  A plaintiff may satisfy the second prong by demonstrating (1) the prison

17  official engaged in a purposeful act or failure to respond to a prisoner's pain or possible medical need,

18  and (2) harm caused by the indifference.  Jett, 439 F.3d at 1096 (citing McGuckin, 974 F.2d at 1060.)

19  Indifference "may appear when prison officials deny, delay or intentionally interfere with medical

20  treatment, or it may be shown by the way in which prison physicians provide medical care."  McGuckin,

21  974 F.2d at 1060.  "A prisoner need not show harm was substantial; however, such would provide

22  additional support for the inmate's claim that the defendant was deliberately indifferent to his needs."

23  Jett, 439 F.3d at 1096.

24          As a threshold matter, the parties dispute whether Aguilar's injuries resulting from the altercation

25  with Delgado constitute a "serious medical need."  Defendants argue that Aguilar's injuries were not

26  "life threatening," and therefore did not merit immediate emergency treatment.  (Repl. at 17:21-23.)  By

27  contrast, Aguilar claims that he was beaten "very badly" and has "permanent damage" to his face and

28  ongoing medical problems as a result.  (Compl. at 4:27-32.)  An inmate's medical injury need not rise to

1   the level of "life threatening," however, to meet the standard of a serious medical need.  The Ninth

2   Circuit addressed this issue in McGuckin, and concluded that

3               [t]he existence of an injury that a reasonable doctor or patient would find

4               important and worthy of comment or treatment; the presence of a medical

5               condition that significantly affects an individual's daily activities, or the

6               existence of chronic and substantial pain are examples of indications that a

7               prisoner has a serious need for medical treatment.

8   974 F.2d at 1059-60; see also Jett, 439 F.3d at 1096 (finding as "undisputed" that an inmate's fractured

9   thumb constituted a serious medical need); Hunt v. Dental Dept., 865 F.2d 198, 201 (9th Cir. 1989)

10  (finding dental problems stemming from deliberate delay in replacement of dentures amounted to a

11  serious medical need).  Although defendants downplay Aguilar's injuries as a simple black eye, bloody

12  nose and a few scratches, the medical reports attached to both Defendants' motion as Exhibit A and to

13  Aguilar's opposition as Exhibit G suggest otherwise.  The Unusual Occurrence Report from Nurse

14  Lewis dated November 23, 2004 indicates that Aguilar had trauma to his right eye/orbit area and

15  multiple abrasions, and that he complained of dizziness, blurred vision and pain in his sinus area.  A

16  consultation report authored by Dr. Mumford dated December 1, 2004 reveals that he suspected a right

17  orbital fracture and recommended an x-ray.  Dr. Mumford also checked a box indicating that this

18  condition significantly affected quality of life, although he also checked a box indicating that the

19  condition was not life threatening.  Finally, a medical report dated December 3, 2004 states that

20  Aguilar's right cheekbone was broken in possibly four places, his fracture would heal on its own if he

21  did not blow his nose for 6 weeks, orbital inflammation could last 6 to 12 months and he could

22  experience temporary or permanent numbness, pain and double vision.  Based on the evidence presently

23  before the Court, none of which is contradictory, the undersigned finds there exist no issues of material

24  fact that would preclude a finding that for purposes of Eighth Amendment analysis Aguilar's injuries

25  constitute a serious medical need to trigger the secondary deliberate indifference analysis.

26         Although Aguilar makes claims for deliberate indifference resulting from both denial and delay

27  of medical treatment, as he was eventually treated, all of his claims are really for delay of treatment.  In

28  the Ninth Circuit, "mere delay of surgery, without more, is insufficient to state a claim of deliberate

11

1    medical indifference . . . unless the denial was harmful." Shapley v. Nevada Bd. of State Prison Com'rs,

2    766 F.2d 404, 407 (9th Cir. 1985).

3                    [A] finding that the defendant's activities resulted in "substantial" harm to

4                    the prisoner is not necessary, although a finding that the inmate was

5                    seriously harmed by the defendant's action or inaction tends to provide

6                    additional support to a claim that the defendant was "deliberately

7                    indifferent" to the prisoner's medical needs: the fact that an individual sat

8                    idly by as another human being was seriously injured despite the

9                    defendant's ability to prevent the injury is a strong indicium of callousness

10                   and deliberate indifference to the prisoner's suffering

11   McGuckin, 974 F.2d at 1060 (internal citations removed).  Once Plaintiff has established the

12   harmfulness of the delay, "it is up to the fact finder to determine whether or not the defendant was

13   'deliberately indifferent' to the prisoner's medical needs." Id.  A finding that the delay in treatment was

14   an "isolated occurrence" or "isolated exception" to the inmate's overall medical treatment tends to weigh

15   against a finding of deliberate indifference.  See e.g. Wood v. Housewright, 900 F.2d 1332, 1334 (9th

16   Cir. 1990); Toussaint v. McCarthy, 801 F.2d 1080, 1111 (9th Cir.1986).  "On the other hand, a finding

17   that the defendant repeatedly failed to treat an inmate properly or that a single failure was egregious

18   strongly suggests that the defendant's actions were motivated by 'deliberate indifference' to the

19   prisoner's medical needs." McGuckin, 974 F.2d at 1060-61.  "In sum, the more serious the medical

20   needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more

21   likely it is that a plaintiff has established 'deliberate indifference' on the part of the defendant." Id. at

22   1061.  In the instant matter, Aguilar has alleged that each defendant engaged in different, distinct acts

23   that caused delay in the treatment of his injuries; therefore, the Court shall consider each defendant's

24   actions separately.

25                         a.    Count II

26        In count II of the complaint, Aguilar alleges that Officers Rees, Fowler, Rankin, Head and

27   Pappas broke up the fight between himself and Delgado at 9:30 p.m.  Aguilar further alleges Delgado

28   was taken immediately to the infirmary, while Aguilar was made to pack his belongings in trash bags

12

1  and taken to an activity room, rather than the infirmary, where he waited until 11:00 p.m. before being

2  taken to the infirmary.  Defendants argue that the Unusual Occurrence Report of Nurse Lewis

3  (Defendants' Exhibit A) indicates that Aguilar was injured at 9:30 p.m. and was seen by her in the

4  infirmary at 9:45 p.m., a delay of merely 15 minutes.  Defendants also contend that Aguilar was sent to

5  the activity room, rather than straightaway to the infirmary, to ensure his safety by avoiding further

6  contact with Delgado.  Defendants allege that Aguilar's injuries were not life threatening and therefore

7  did not require immediate attention.

8          Aguilar responds that he was assaulted at 9:15 p.m., and that he was not seen by Nurse Lewis

9  until 11:00 p.m.  He also points out that the affidavit of Officer Ryan Pappas, attached as Exhibit G to

10  Defendants' motion, states that Aguilar was still in the activity room at 10:00 p.m. when Officer Pappas

11  was relieved from duty.  From this discrepancy, Aguilar concludes that the times listed in Nurse Lewis'

12  report were fabricated.  He also contends that his injuries were more serious than Defendants'

13  characterization and that he was in severe pain, making it unreasonable to make him pack his belongings

14  and carry them to the activity room, rather than send him immediately to the infirmary for treatment.

15          The Court finds that officers Rees, Head, Rankin and Pappas have not presented uncontroverted

16  evidence to support their argument in favor of summary judgment on count II.   The affidavits presented

17  by officers Rees and Head do not demonstrate personal knowledge that would support a finding that no

18  material issues of fact exist with respect to this claim.  Officer Rees' affidavit, attached as Defendants'

19  Exhibit D, contains a statement that he "cannot recall this particular incident." (Defs'. Ex. D at ¶ 3.)  He

20  goes on in paragraph 6 of his affidavit to speculate why the medical staff released Aguilar from their

21  care, and what he would have done had Aguilar exhibited signs of a concussion.  (Id. at ¶6.)  Officer

22  Rees may speculate as to what he would have done in this situation, but affidavits in support of a motion

23  for summary judgment require more than a prison officer's pledge of good intentions; such affidavits

24  must demonstrate personal knowledge of the events to preclude a finding that material issues of fact

25  exist with respect to the claim.  British Airways Bd. , 585 F.2d at 946.  Therefore, the Court finds that

26  Officer Rees has not demonstrated that there exist no issues of material fact, and the Court cannot enter

27  summary judgment in his favor.

28          Similarly, Officer Head's affidavit, attached as Defendants' Exhibit E, does not demonstrate

1 | personal knowledge because it purports to incorporate his officer's report that is not attached to the

2 | affidavit.  The affidavit otherwise states nothing of substance.  Therefore, as with Officer Rees, the

3 | Court finds that Officer Head has not demonstrated that there exist no issues of material fact, and cannot

4 | enter summary judgment in his favor.

5 |       The affidavit presented by Officer Pappas, attached as Defendants' Exhibit G, indicates that he

6 | told Aguilar to pack his belongings in trash bags, and that Aguilar was in the activity room until 10:00

7 | p.m. when Pappas was relieved from duty.  Officer Pappas's account of the timeframe of these actions is

8 | directly contradicted by the Unusual Activity Report authored by Nurse Lewis, which claims that

9 | Aguilar was in the infirmary by 9:45 p.m.  (See Defs.' Ex. A.)  Defendants do not respond to Aguilar's

10 | argument that the two exhibits directly contradict one another, and rely on the 15 minute elapse of time

11 | in Nurse Lewis's account.  Defendants' own internal inconsistencies establish that there exist material

12 | issues of fact.  Therefore, the Court orders summary judgment denied with respect to Officer Pappas.

13 |       However, Officer Fowler is entitled to qualified immunity with respect to count II.  Officer

14 | Fowler's affidavit, attached as Exhibit F, indicates that he was present for the fight, but left to return to

15 | his assigned unit after it was broken up and the two inmates were placed in handcuffs.  As a result, he

16 | was not involved in the actions or decision-making that lead to delaying Aguilar's medical treatment or

17 | making him pack his belongings and carry them to the activity room.  Aguilar has not presented any

18 | admissible evidence that rebuts Officer Fowler's version of the events.  Therefore, the Court finds there

19 | exist no material issues of fact that would preclude a ruling as a matter of law, and that Officer Fowler is

20 | entitled to qualified immunity as he was not present for any of the conduct Aguilar alleges.

21 |               **b.**        **Count III**

22 |       Count III concerns the actions of a nurse named as a Jane Doe, but identified by Defendants as

23 | Nurse Denise Lewis ("Nurse Lewis").  Aguilar alleges that Nurse Lewis conducted an evaluation and

24 | told him in the presence of a correctional officer that he had a concussion and urgently needed to see a

25 | doctor in the morning for x-rays and to determine the source of his bleeding.  He argues that Nurse

26 | Lewis should have kept him in the infirmary overnight, rather than discharge him to the correctional

27 | officer, and failed to schedule him for an appointment with a doctor the following morning for x-rays

28 | and further care.  Aguilar asserts that these failings amount to "deliberate indifference."  Defendants

1  argue that Nurse Lewis performed an appropriate medical evaluation, gave Aguilar ointment and pain

2  medication and scheduled him for an x-ray.  Their argument is supported by Nurse Lewis's "Unusual

3  Activity Report" that is authenticated by the affidavit of Karen Walsh and attached as Exhibit A.

4  Defendants contend that these actions were appropriate to the situation, because Aguilar's injuries did

5  not merit an overnight stay in the infirmary and  Nurse Lewis cannot be held responsible for any

6  subsequent delay in Aguilar's treatment.

7      The parties do not dispute the facts with respect to count III, but rather whether Nurse Lewis'

8  actions were objectively reasonable such that she would be entitled to qualified immunity.  The Court

9  finds that she is so entitled.  Taken in the light most favorable to Aguilar, Nurse Lewis's actions at most

10 amount to medical malpractice, which does not rise to the level of an Eighth Amendment violation.  See

11 Estelle, 429 U.S. at 106 (concluding that medical malpractice does not become a constitutional violation

12 when the victim is a prisoner).  Accordingly, the Court grants summary judgment in favor of Defendants

13 on count III.

14             **c.      Count IV**

15     In count IV, Aguilar alleges that Officer Rees placed him in solitary confinement following his

16 discharge from the infirmary on the night of his fight with Delgado, and that had he not done so other

17 correctional officers would not have kept him in solitary confinement for eight days during which he was

18 denied access to medical treatment.  Defendants respond that Officer Rees acted in Aguilar's best

19 interest by placing him in solitary confinement where he could not be harmed, and by checking on him

20 every 15 minutes.  Defendants assert that Officer Rees cannot be responsible for subsequent delays to

21 Aguilar's medical treatment caused by other correctional officers.

22     In support of their argument, Defendants attach the affidavit of Officer Rees as Exhibit D.  The

23 Court has already determined, *supra*, that Officer Rees' affidavit is not based on personal knowledge.

24 Rule 56(e) requires that all affidavits attached in support of a motion for summary judgment be

25 supported by affidavits demonstrating personal knowledge.  As a result, the Court finds that there exist

26 issues of material fact that preclude a ruling as a matter of law on this claim, and that Defendants'

27 request for summary judgment on count IV should be denied.

28

#### d.      Count V

Count V contains allegations against two John Does, whom Aguilar describes as classification officers, and whom he alleges sent him to solitary confinement where they knew or had reason to know Aguilar would be denied access to medical treatment for eight days.  Defendants argue that the classification officers merely listened to Aguilar's account of the fight for purposes of a subsequent hearing and assigned Aguilar to solitary confinement for his own safety.

Defendants have not supported any of their arguments with materials outside the pleadings. Therefore, the Court cannot consider Defendants arguments with respect to count V as a request for summary judgment, but instead as a motion to dismiss.  As was discussed *supra*, however, the Court already determined in its screening order that Aguilar has stated claims with respect to all of the counts in the complaint.  Defendants motion does not argue that the Court's order was erroneous or should be reconsidered.  Therefore, the Court recommends that Defendants request for dismissal of count V be denied.

#### e.      Count VII

In count VII, Aguilar claims that several John or Jane Does failed to process his medical "kites," or requests, seeking an appointment with a doctor to address complications from his injuries sustained during his fight with Delgado, including blurred, reduced and double vision; eye irritation; and numbness to the face.  Defendants argue that as a threshold matter, the medical staff did not receive Aguilar's medical "kites," and therefore were unaware of Aguilar's medical needs.  This argument is supported by the response to grievance 2006-26-4066, which is attached as exhibit B and authenticated by the Affidavit of Susan Statler.  The response states:

> Spoke with Debbie from Medical and she said inmate was seen by a specialist in town December 3, 2004.  Specialist stated no follow up needed.  On 11/16/2005 received a kite from him complaining about his back.  He was seen by (PA) on 11/30/2005.  No other kite received. Inmate needs to forward kite to see the doctor.

Id.

16

1    In response, Aguilar presents the kites he allegedly filed March 2, 2005; May 21, 2005; October

2   20, 2005; January 30, 2006; and March 12, 2006 as Exhibit M to his motion.  He also presents as Exhibit

3   C a letter he wrote to Glen Whorton, Director of NDOC, on March 17, 2006, along with the responses

4   he received.  Neither of these exhibits are authenticated, and Aguilar has not presented any additional

5   evidence in support of his response.  "A trial Court can only consider admissible evidence in ruling on a

6   motion for summary judgment . . . [and] [a]uthentication is a condition precedent to admissibility."  Orr

7   v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002) (quoting Fed. R. Evid. 901(a)) (internal

8   quotations removed).  Authentication is satisfied by "evidence sufficient to support a finding that the

9   matter in question is what its proponent claims."  Fed. R. Evid. 901(a).  The Ninth Circuit has

10   "repeatedly held that unauthenticated documents cannot be considered in a motion for summary

11   judgment."  Id. (citing Cristobal v. Siegel, 26 F.3d 1488, 1494 (9th Cir. 1994)).  "In a summary

12   judgment motion, documents authenticated through personal knowledge mut be 'attached to an affidavit

13   that meets the requirements of [Fed.R.Civ.P.] 56(d) and the affiant must be a person through whom the

14   exhibits could be admitted into evidence.'"  Id. at 773-74 (quoting Canada v. Blain's Helicopters, Inc.,

15   831 F.2d 920, 925 (9th Cir. 1987)) (brackets in original).  "However, a proper foundation need not be

16   established through personal knowledge but can rest on any manner permitted by Federal Rule of

17   Evidence 901(b) or 902."  Id. at 774.

18    Aguilar was made aware of these rules in the Court's Order (#25).  Absent the unauthenticated

19   evidence, Aguilar cannot demonstrate that the prison or medical staff knew or should have known of his

20   need for medical treatment as the evidence Defendants have presented demonstrate that they promptly

21   responded to those medical kites of which they claim to have been aware.  Moreover, from a review of

22   the complaint allegations, it is clear that while Aguilar claims he was denied medical treatment, what he

23   really means is that he was denied treatment at the time he requested it because he readily admits that he

24   eventually received appropriate treatment.  The authenticated evidence before the Court does not support

25   Aguilar's definition of denial, however, because the evidence indicates that Aguilar received treatment

26   each time it was requested.  As a result, the Court finds that there are no issues of material fact that

27   would preclude a ruling as a matter of law, and the Court grants summary judgment in favor of

28   Defendants on count VII.

## 2.    Count VIII Claim for Environmental Tobacco Smoke Exposure

Aguilar's final Eighth Amendment claim in count VIII is for exposure to ETS. Defendants have not presented any materials outside the pleadings to support their argument with respect to count VIII. Therefore, the Court must consider their arguments under the Rule 12(b)(6) standard, and as discussed *supra*, the Court must deny Defendants' request to dismiss the complaint as the Court has already determined that Aguilar states a claim in count VIII.

Defendants' primary argument is that Aguilar cannot make an Eighth Amendment claim for ETS exposure because he was not particularly susceptible to harm from ETS, and he only claims a risk of future health problems. In Helling v. McKinney, the Supreme Court held for the first time that a prisoner's Eighth Amendment claim could be based upon possible future harm to health, as well as past and present harm, arising out of exposure to ETS. 509 U.S. 25, 35 (1993). A claim for ETS exposure under the Eighth Amendment contains both objective and subjective factors. Id. "With respect to the objective factor, [the prisoner] must show that he himself is being exposed to unreasonably high levels of ETS." Id.

> Also with respect to the objective factor, determining whether [a prisoner's] conditions of confinement violate the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a Court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

Id. at 36. The second or subjective factor is that of "deliberate indifference, [which] should be determined in light of the prison authorities' current attitudes and conduct . . . ." Id. In Helling, which also involved a claim against NDOC, the Supreme Court noted that the adoption of a prison smoking policy would "bear heavily on the inquiry into deliberate indifference." Id.

As Defendants point out in their motion, the Supreme Court's <u>Helling</u> decision did not define what would constitute an unreasonably high level of ETS to state a claim for an Eighth Amendment violation.  The Second Circuit has held, however, that <u>Helling</u> is not limited to its unique set of facts. <u>Warren v. Keane</u>, 196 F.3d 330, 333 (2d Cir. 1999).  The only published decision in the Ninth Circuit on this issue is a district court decision from the District of Nevada that was later overturned on appeal in an unpublished decision, and subsequently dismissed on remand for the prisoner's failure to exhaust his administrative remedies.  <u>See</u> <u>Jones v. Bayer</u>, 190 F.Supp.2d 1204 (D. Nev. 2002) <u>reversed</u> <u>and</u> <u>remanded</u> <u>by</u> 56 Fed.Appx. 408 (9th Cir. 2003) <u>and</u> <u>dismissed</u> <u>by</u> No. 3:99-CV-00088-ECR-RAM, #297 (D. Nev. filed May 24, 2004).  In <u>Jones</u>, a prisoner claimed he was exposed to unreasonably high levels of ETS that exacerbated his chronic sore throat condition when he shared a cell for 42 consecutive days with another inmate who smoked between 20 and 50 cigarettes per day.  <u>Jones</u>, 190 F.Supp.2d at 1207-08.  The district court held that "[w]hile society has in recent years become more and more sensitive to the issue of exposure to ETS, plaintiff's 42 days with a smoker still is not so grave as to be a violation of contemporary standards of decency."  <u>Id.</u> at 1208.  In reversing the district court's decision, the Ninth Circuit noted that the prisoner suffered from a chronic throat condition that significantly affected his quality of life, and which was exacerbated by exposure to ETS.  <u>Jones</u>, 56 Fed.Appx. at 409.  The court went on to find that a reasonable jury could conclude that defendants were deliberately indifferent to the prisoner's heightened vulnerability when they denied his repeated requests to move to a different cell. <u>Id.</u>  Similarly, the Second Circuit held that a prisoner stated a claim under the Eighth Amendment when he alleged that he was housed with multiple inmates who smoked and was denied a request to open a window for fresh air, resulting in dizziness, difficulty breathing, blackouts, and respiratory problems. <u>Davis v. New York</u>, 316 F.3d 93, 101 (2d Cir. 2002).  The court found that "[t]hese assertions are not mere conclusory allegations, but may be sufficient to create an issue of fact as to the level of smoke to which Davis was exposed and, thus, whether his Eighth Amendment rights were violated."  <u>Id.</u>

In the instant matter, Aguilar claims he was exposed to unreasonably high levels of ETS while being made to share a cell on three separate occasions with three different inmates who were heavy smokers despite being a registered non-smoker.  He claims he was housed with inmate Richard Delgado for 26 days in 2004, inmate Gabriel Ruiz for 89 days in 2005, and inmate Jose Garcia for 72 days in

1   2006.  He claims that all three of these cell mates were "heavy smokers."  He does not allege that he

2   suffers from any particular ailment as a result of ETS exposure, or that ETS exposure exacerbated an

3   existing medical condition.  Instead, Aguilar is concerned exclusively with the risk that exposure to ETS

4   during this period will damage his future health.

5          Defendants respond prison officials should always be entitled to qualified immunity on claims of

6   ETS exposure because the Supreme Court's Helling decision did not set a level of ETS exposure that

7   was "unreasonably high," and therefore, unless exposure levels were "clearly" unreasonably high, or the

8   inmate suffered from an ailment that was exacerbated by ETS exposure, reasonable prison officials

9   could not conclude that placing a non-smoking inmate with a smoking inmate was a constitutional

10  violation.  (See Mot. at 16:19-17:5.)  In response, Aguilar argues that ETS has been scientifically proven

11  to be harmful, and that society no longer tolerates ETS as it once did, as evidenced by the recent passage

12  in Nevada of a statewide smoking ban in certain public places.  He further argues that his repeated

13  placement with smoking cell mates violates NDOC's smoking policy adopted January 10, 1992.  In their

14  reply brief, Defendants argue that Aguilar did not have a medical condition that would prohibit him

15  being housed with a smoker.  (Repl. at 6:17-21.)

16         Defendants do not explain what a "clearly" unreasonably high level of ETS exposure would be,

17  and in doing so appear to seek a heightened requirement beyond the "unreasonably high" standard

18  imposed by the Supreme Court in Helling.   The Court also finds Defendants' argument that prison

19  officials should essentially always be granted qualified immunity with respect to ETS claims because

20  Helling does not provide a clear standard for "unreasonably high" levels of ETS lacks merit because it

21  would render the Helling decision meaningless.  Moreover, case law in the Ninth Circuit is to the

22  contrary, particularly with respect to NDOC inmates.  In Jones, the Ninth Circuit found an NDOC

23  inmate stated claims under the Eighth Amendment for ETS exposure.  See e.g. Jones, 56 Fed.Appx. at

24  408.  In addition, the Helling case itself involved a claim by an inmate against NDOC.  Finally, although

25  Defendants are correct that Aguilar does not claim to have a medical condition that would prohibit him

26  from being housed with a smoker, or has suffered immediate harm from exposure to ETS, Helling does

27  not require a plaintiff to have suffered either kind of harm to state an Eighth Amendment claim.  An

28  Eighth Amendment ETS exposure claim may be sustained on the risk of future harm resulting from ETS

1  exposure alone, provided a plaintiff can show "that he himself is being exposed to unreasonably high

2  levels of ETS."  509 U.S. at 35; see also Henderson v. Sheahan, 196 F.3d 839, 848-49 (7th Cir. 1999)

3  (finding that inmates may collect damages for the risk of future harm from ETS exposure independent of

4  a claim for present injury).  In sum, the Court finds that Aguilar has stated a claim under the Eighth

5  Amendment for exposure to ETS and denies Defendants' motion with respect to count VIII.

6          **B.     Fourteenth Amendment Claim**

7          Aguilar claims a Fourteenth Amendment due process violation in count VI of his complaint

8  against Officer Stout concerning the administrative hearing in which he was found to be responsible for

9  the fight with Delgado and was ordered to pay restitution out of his inmate account to cover Delgado's

10  medical bills.  Aguilar argues that Officer Stout's finding in favor of Delgado was erroneous because

11  Delgado initiated the fight, while Aguilar was the victim.  In addition, he contests the amount of

12  restitution he was ordered to pay and contends he should have the right to review Delgado's medical

13  bills for purposes of an appeal.  He alleges that he filed a grievance to appeal the result of the hearing,

14  but did not receive a response.  Although he presents a copy of this grievance as Exhibit A, Aguilar has

15  failed to authenticate it.  He filed subsequent appeals that were returned to him marked untimely.

16  Defendants argue in their motion that Aguilar was not denied due process in the hearing, but is simply

17  unhappy with the outcome.  They point out that a grievance is not the proper way to appeal an

18  administrative decision, and thus any later appeal was untimely.  Finally, they argue that Aguilar is

19  prohibited by Administrative Regulation ("A.R.") 639 from viewing Delgado's medical records for

20  reasons of privacy and safety.

21          "Due process only requires a meaningful hearing appropriate to the nature of the case."  Jordan v.

22  City of Lake Oswego, 734 F.2d 1374 (9th Cir. 1984) (citing Bell v. Burson, 402 U.S. 535 (1971)).

23  "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due

24  a defendant in such proceedings does not apply."  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

25  "Where restitution is being sought, due process is afforded by providing a defendant an adequate

26  opportunity to present his objections."  Ruley v. Nevada Board of Prison Commissioners, 628 F.Supp.

27  108, 112 (D. Nev. 1986).  "Although a properly conducted prison disciplinary hearing generally satisfies

28  due process, deprivation of property by means of an unlawfully conducted hearing can be violative of

1   due process, for which § 1983 provides a remedy in federal court."  Id. at 110 (citing Jones v. Clark, 607

2   F.Supp. 251, 256-57 (E.D. Pa. 1984)).

3         Aguilar's complaint does not allege that the method by which the hearing was conducted violated

4   due process, but that the result was unjust.  He does not claim that he was denied an adequate

5   opportunity to present his objections during the hearing, and thus the Court finds he was not denied due

6   process with respect to the conduct of the hearing that lead to the award of restitution in favor of

7   Delgado.

8         By contrast, Aguilar has presented evidence that he did timely file an appeal of the administrative

9   decision and award of restitution, and that Defendants did not properly process that appeal.  (See Def.'s

10  Ex. A.)  The Ninth Circuit has concluded, however, that the Supreme Court's decision in Sandin v.

11  Conner, 515 U.S. 472 (1995) forecloses an inmate from stating a claim for a due process violation

12  arising out of the improper processing of an internal appeal of an administrative hearing "because

13  inmates lack a separate constitutional entitlement to a specific prison grievance procedure."  Ramirez v.

14  Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (citing Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988)).

15  Therefore, Aguilar's Fourteenth Amendment claim with respect to his administrative appeal is denied.

16        Finally, Aguilar claims that due process requires him to have access to Delgado's medical

17  records to enable him to contest the *amount* of restitution awarded.  As the Court has found that Aguilar

18  cannot claim a constitutional due process violation in Defendants' failure to process his appeal, this

19  aspect of his Fourteenth Amendment claim is arguably moot.  That said, Aguilar cannot claim a right to

20  access this material where, as here, NDOC has by way of an administrative regulation prohibited inmates

21  from viewing one another's medical records to protect inmates' personal safety.  (See A.R. 639.)

22  Although inmates are generally entitled to written statements of the evidence against them, the Supreme

23  Court has long recognized that "there will be occasions when personal or institutional safety is so

24  implicated that the statement may properly exclude certain items of evidence . . .."  Wolff v. McDonnell,

25  418 U.S. 539, 565 (1974).   Accordingly, the Court finds that there exist no issues of material fact that

26  would preclude a ruling as a matter of law in favor of Defendants on this count of Aguilar's complaint.

27

28

**IV.    Punitive damages**

Defendants contend that punitive damages are unavailable to Aguilar because he failed to allege Defendants acted maliciously, wantonly or oppressively, and are barred by Nevada Revised Statute ("NRS") § 41.035(1).  Aguilar responds that the allegations in his complaint show that Defendants acted maliciously, wantonly and oppressively.  Defendants have not presented any materials outside the pleadings with respect to this claim; therefore the Court must consider their argument under Rule 12(b)(6).  As the Court has already found that Aguilar stated a claim in the Court's screening order, Defendants' motion must be denied.

Moreover, as a general matter, punitive damages are available under § 1983. See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 17 (1991); Morgan v. Woessner, 997 F.2d 1244, 1255 (9th Cir.1993). State officials sued in their official capacity are immune from punitive damages. Mitchell v. Dupnik, 75 F.3d 517, 527 (9th Cir.1996). Public officials may, however, be liable for punitive damages in their individual capacities.  Smith v. Wade, 461 U.S. 30, 51 (1983)  Punitive damages are awarded at the jury's discretion. See Smith, 461 U.S. at 54 (1983); Woods v. Graphic Communications, 925 F.2d 1195, 1206 (9th Cir.1991). "It is well-established that a jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others." Morgan, 997 F.2d at 1255 (quoting Davis v. Mason County, 927 F.2d 1473, 1485 (9th Cir. 1991)) (internal quotations removed).

Taking Defendants' latter argument first, their citation to NRS § 41.035(1) is inapposite.  That statute prohibits an award of punitive damages against present or former officers or employees of the state in actions under state law, but has no application to federal claims under § 1983.  Clements v. Airport Authority of Washoe County, 69 F.3d 321, 336-37 (9th Cir. 1995) (citing Carey v. Piphus, 435 U.S. 247, 257-58 n.11 (1978)).  Therefore, NRS § 41.035(1) does not bar punitive damages for Aguilar's individual capacity claims under § 1983.

With respect to the former argument, the Court disagrees with Defendants that Aguilar needed to specifically allege Defendants acted maliciously, wantonly or oppressively in light of the notice form of pleading under the Federal Rules of Civil Procedure and the less stringent standard to which *pro se* plaintiffs' pleadings are to be held.  Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam).  Aguilar's

23

1   complaint made a demand for punitive damages, in addition to compensatory damages and an

2   injunction.  (See Compl. at 9.)  Whether Aguilar will be able to succeed on his remaining claims, and

3   prove an entitlement to punitive damages, is quite another matter, but the Court finds no reason to

4   dismiss his claim for punitive damages as a matter of law at this stage.

5   **V.      Motion for Appointment of Counsel**

6          This motion is Aguilar's second request for appointment of counsel.  Previously, the Court found

7   that Aguilar had not established that he was unable to afford private counsel, or that the legal issues

8   involved were too complex to be presented adequately without assistance of counsel.  (Order, #11.)  In

9   addition, the Court found that Aguilar had demonstrated throughout this case his ability to articulate his

10  arguments clearly.  (Id.)  Aguilar's second motion does not present a significant change in circumstances

11  that would merit the appointment of counsel *pro bono*.  Although Aguilar claims that his family

12  unsuccessfully attempted to hire an attorney, the complexity of the issues at bar are no different than they

13  were at the outset of the case, and Aguilar continues to demonstrate his ability to articulate

14  clearly his arguments with citations to relevant case law and evidence.  Accordingly, his second request

15  for appointment of counsel is denied.

16                                  **CONCLUSION**

17         Pursuant to Rule 56(f), the Court denies Defendants' motion to dismiss with respect to count I to

18  allow Aguilar to conduct discovery to ascertain the identity of the person responsible for the conduct

19  alleged in count I.  However, the claims against Defendant Kuloloia are dismissed.  Having already

20  found in the Court's prior screening order that Aguilar stated claims in his complaint, the Court denies

21  Defendants' motion to dismiss with respect to claims for which they have not presented materials

22  outside of the pleadings.  On that basis, the Court denies the motion with respect to counts V and VIII.

23  Finally, with respect to those claims for which Defendants presented materials outside of the pleadings,

24  having reviewed the facts of Plaintiff's complaint and response in the light most favorable to him, the

25  Court finds that there are no issues of material fact that would preclude resolution of the claims as a

26  matter of law with respect to counts III, VI and VII as well as count II with respect to Officer Fowler

27  only.  The Court finds, however, that material issues of fact prohibit resolution of counts II and IV.

28  Accordingly

**IT IS HEREBY ORDERED** that:

1.  Defendants' Motion to Dismiss (#14) be **GRANTED IN PART**, and **DENIED IN PART**, according to the following:

    a.  The motion is **GRANTED** with respect to counts III, IV and VII, and with respect to count II as it applies to Officer Fowler only, and with respect to Count I as it applies to Defendant Kuloloia.

    b.  The motion is **DENIED** in all other respects.

2.  Plaintiff's request to deny Defendants' motion with respect to count I to allow him to conduct discovery is **GRANTED**.

3.  Plaintiff's Second Ex Parte Motion for Appointment of Counsel (#33) is **DENIED**.

DATED this 28th day of September 2007.

_____
Kent J. Dawson
United States District Judge